In The

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

No. 22-1734

---

JASON SMITH

Plaintiff-Appellant

vs.

CITY OF CHICAGO, KARLO FLOWERS, SYDNEY ROBERTS,
JAMES MURPHY- AGUILU

Defendants-Appellees,

Appeal of
JASON SMITH

---

Appellant
On the Appeal from the United States District Court
For the Northern District of Illinois, Honorable Gary Feinerman, Case No.
18CV-08075

BRIEF OF PLAINTIFF-APPELLANT

Jason Smith
3515 W. Cermak
Chicago, Illinois 60623
jason_smith54@yahoo.com

Appellant

i

Appellate Court No. 22-1734

JASON SMITH

v.

CITY OF CHICAGO, KARLO FLOWERS, SYDNEY ROBERTS,
JAMES MURPHY- AGUILU

RULE 26.1 CORPORATE DISCLOSURE STATEMENT
AND LOCAL RULE 26.1 DISCLOSURE STATEMENT

The undersigned, Smith, furnishes the following in compliance with

Seventh Circuit Rule 26.1:


1.  Plaintiff-Appellant Jason Smith is an individual party to this action.  Plaintiff-

Appellant is neither a corporation nor a government party.


Dated: June 27, 2022

## Request For Oral Argument

Plaintiff-Appellant requests oral argument on this matter as the decisional process may be enhanced by oral argument, pursuant to Fed. R. App. P. 34(a).

# Table Of Contents

Page

Disclosure Statement ...............................................................................ii

Request For Oral Argument ...................................................................iii

Table Of Contents ...................................................................................iv

Table Of Authorities ..............................................................................viii

Jurisdictional Statement..........................................................................1

Statement Of The Issues...........................................................................2

Statement Of The Case...............................................................................3

Summary Of The Argument ...................................................................10

Appellate Standard Of Review ...............................................................11

Argument ..........................................................................................12

I.      Title VII and ICRA Retaliation Claims

II.     Defamation..................................................................................18

II.     Indemnification..........................................................................20

Conclusion ...............................................................................................21

Certificate Of Compliance With Rule 32(a)..........................................22

Circuit Rule 30(d) Statement .................................................................23

Proof Of Service ……………………………………………………………24

Appendix ………………………………………………………………………25

# Table Of Authorities

## Cases

*Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520 (7th Cir. 2003). .......................... 13, 17

*Babrocky v. Jewel Food Co.*, 773 F.2d 857 (7th Cir. 1985).................................... 18, 20

*Baker v. Washington Bd. of Works*, 2000 U.S. Dist. LEXIS 21236 (S.D. Ind. 2000) 37

*Bogie v. Rosenberg*, 705 F.3d 603 (7th Cir. 2013) ................................................. 9

*Bohen v. East Chicago*, 799 F.2d 1180 (7th Cir. 1986)........................................... 30, 37

*Burlington N. R.R. v. Ford*, 504 U.S. 648 (U.S. 1992).............................................. 37

*Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (U.S. 2006) ........ 22, 23, 24

*Chaib v. Indiana*, 2014 U.S. App. LEXIS 3417 (7th Cir. 2014)................................... 21

*Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497 (7th Cir. 1994)..................................... 12, 17

*Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580 (7th Cir. 2012) ....................................................................................................................... 9

*Contreras v. City of Chicago*, 119 F.3d 1286 (7th Cir. 1997)..................................... 37

*Cox v. United States Gypsum Co.*, 409 F.2d 289 (7th Cir. 1969) ............................... 11

*Danner v. Phillips Petroleum Co.*, 447 F.2d 159 (5th Cir. 1971)), *certiorari denied*, 429 U.S. 986, 97 S. Ct. 506, 50 L. Ed. 2d 598 (1976).......................................... 18

*Foman v. Davis*, 371 U.S. 178 (1962)..................................................................... 34

*Haines v. Kerner*, 404 U.S. 519, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972) .................. 11

*Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014 (7th Cir. 2003). ................... 14

*Hobbs v. City of Chi.*, 573 F.3d 454 (7th Cir. 2009) .............................................. 22

*Jenkins v. Blue Cross Mut. Hospital Ins., Inc.*, 538 F.2d 164 (7th Cir. 1976)............ 12

*Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164 (7th Cir. 1976) ............................................................................................................................... 18

*Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109 (7th Cir. 2001). .............................. 17

*Knox v. Indiana*, 93 F.3d 1327 (7th Cir. 1996)....................................................... 26

*Knox v. Indiana*, 93 F.3d 1327 (7th Cir. 1996)....................................................... 24

*Kristufek v. Hussman Foodservice Co., Toastmaster Div.*, 985 F.2d 364 (7th Cir. 1993) ....................................................................................................................... 11

*Love v. Pullman Co.*, 404 U.S. 522 (1972)............................................................. 11, 14

*Malhotra v. Cotter & Co.*, 885 F.2d 1305 (7th Cir. 1989) ....................................... 15

*Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036 (7th Cir. 2000)......................... 22

*McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558 (7th Cir. 2000)......... 30

*Motorola, Inc. v. McLain*, 484 F.2d 1339 (7th Cir. 1973)......................................... 11

*Nead v. Bd. of Trs.*, 2006 U.S. Dist. LEXIS 36897 (C.D. Ill. 2006)............................. 37

*Philbin v. General Electric Capital Auto Lease, Inc.*, 929 F.2d 321 (7th Cir. 1991) . 12

*Reed v. Faulkner*, 842 F.2d 960 (7th Cir. 1988). .................................................... 35

*Reger Development v. National City Bank*, 592 F.3d 759 (7th Cir. 2010). ................... 9

*Rice v. City of Kendallville*, 2009 U.S. Dist. LEXIS 27795 (N.D. Ind. 2009). ............ 37

*Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir. 1992) ..................................... 14, 15

*Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698 (7th Cir. 2001) ...................................... 22

*Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698 (7th Cir. 2001), ................................... 26

*Thompson v. Memorial Hosp. of Carbondale,* 625 F.3d 394 (7th Cir. 2010) ......... 10, 13

*Tramm v. Porter Memorial Hosp.,* 1989 U.S. Dist. LEXIS 16391 (N.D. Ind. 1989); . 37

*Vance v. Ball State Univ.,* 646 F.3d 461 (7th Cir. 2011) .................................................. 25

*Venters v. City of Delphi,* 123 F.3d 956 (7th Cir. 1997) .................................................. 37

*Walker v. Mueller Indus., Inc.,* 408 F.3d 328 (7th Cir. 2005) ........................................ 22

*Willis v. Chicago Extruded Metals Co.,* 375 F. Supp. 362 (N.D. Ill. 1974) ................. 11

*Winsley v. Cook County, 563 F.3d 598 (7th Cir. 2009)* ................................................. 22

**Statutes**

28 U.S.C. § 1291 ........................................................................................................................ 1

28 U.S.C. § 1331 ........................................................................................................................ 1

28 U.S.C. § 1343 ........................................................................................................................ 1

42 U.S.C. § 1983 ........................................................................................................ 1, 3, 28, 29

42 U.S.C. § 2000e *et seq.* ...................................................................................... 1, 3, 12, 28

**Regulations**

29 C.F.R. § 1601.12(b) ........................................................................................................... 12

## Jurisdictional Statement

Subject matter jurisdiction was properly exercised by the district court under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This action arose under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended; ICRA, defamation claim under Illinois law, and Indemnification. Plaintiff was a citizen of the State of Illinois. Defendant City of Chicago, is a municipal corporation in the State of Illinois operating in the Northern District of Illinois. KARLO FLOWERS, SYDNEY ROBERTS, JAMES MURPHY- AGUILU are citizens of the state of Illinois.

The Court of Appeals has jurisdiction in this matter under 28 U.S.C. § 1291.

On March 30, 2022, a final order was entered granting summary judgment in favor of all City of Chicago Defendants on a motion for summary judgment (App. 1, **2-19**) There are no claims remaining before the district court with the City of Chicago and individual defendants. There are no motions or orders that have been filed or entered since the entry of final judgment on March 30, 2022, except for bill of costs.

There are no prior appellate proceedings in this matter for the City of Chicago and individual defendants.. The notice of appeal was filed on April 28, 2022.

[1] "App. __" refers to Smith's attached Appendix.

1

## Statement Of The Issues

1.  Did Smith establish a retaliation [claim] under Title VII.

2.  Did Smith state a defamation claim under Illinois law

3.  Did Smith establish liability, under a respondeat superior theory, for Flowers's and Murphy-Aguilu's alleged defamation.

## Statement Of The Case

This action arose under This action arose under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. , as amended;  ICRA, defamation claim under Illinois law, and Indemnification.

The Plaintiff filed a complaint with the EEOC and the Illinois Department of Human Rights in July 2018.The EEOC issued the Plaintiff his right to sue in or about November 2018.

Smith is an African American,   At all relevant times,

Jason Smith, formerly employed as a Cook County Juvenile Probation Officer by the Hon. Timothy Evans, Chief Judge of the Circuit Court of Cook County, Illinois ("Chief Judge"), and formerly employed with the City of Chicago as an Investigator with the Civilian Office of Police Accountability contend that defendants City of Chicago, Sydney Roberts, Karlo Flowers, James Murphy Auguliu (COPA) and have discriminated against him, tolerated discrimination of him and retaliated against him, defamed his reputation for advocating for equal justice on the basis of his race through their subordinates and the City of Chicago.

William Patterson, Katherine Gailbraith-Verrant, Avik Das and Jennifer Nunez contacted the City of Chicago, COPA Karlo Flowers, Sydney Roberts and falsely claim that the plaintiff was still employed with Cook County. The City of Chicago, Sydney Roberts, Karlo Flowers, assisted Chief Judge Timothy Evans, Avik Das, William Patterson, Jennifer Nunez, Katherine Gailbraith-Verrant with retaliation and discrimination by discharging him from his position with the City of Chicago as an Investigator.

3

Plaintiff was employed by the Chief Judge of the Circuit Court of Cook County for fifteen years from 2003 to 2018. The plaintiff exceeded the performance standards of the Chief Judge for fifteen years from 2003 -2018. From 2003 thru 2018, the plaintiff received over fifty commendations for his presentations and addressing delegations that visited the department, presenting at National Conferences, his work performance with monitoring probationers in high risk areas and assisting with orientation for other agencies.

On May 15, 2012, Smith was elected Vice President of AFSCME Local 3477 and defeated Avik Das in an election for Union Officers with Avik Das writing, "Therefore, I would like to acknowledge that the 2012-2014 term of Local 3477 Executive Board has begun with the following elected leaders."

In 2012, the plaintiff made his first request for juvenile probation officers' discipline records for the preceding five years. On several occasions the defendant employer refused to turn over the records, citing pretextual excuses, such as the information was"irrelevant," or could not be found. Finally, the Plaintiff filed an unfair labor charge against the defendant Chief Judge, which resulted in a decision compelling the defendant Chief Judge to turn over the records. Smith recognized that claims of racial discrimination to the EEOC, the Illinois Department of Human Rights ("IDHR"), the federal courts, and arbitration were failing due to the failure to allege and document a pattern and practice of racially disparate treatment

In 2014, with the aid of the compelled records, the plaintiff sent a letter to the Civil Rights Division, Employment Litigation Section, Department of Justice, requesting the initiation of an investigation into racial discrimination within the Cook County Juvenile Probation Department. A copy of the letter was sent to defendant Chief Judge.

In 2014, the plaintiff was a witness in Kaletha Seay's discrimination complaint. The plaintiff provided evidence and testimony that resulted in a negotiated settlement over her claims.

In 2014, the plaintiff was a witness in Lauren Brown's discrimination complaint. The plaintiff provided evidence and testimony about the discriminatory treatment of African Americans when it comes to discipline and the terms and conditions.

In 2014, the plaintiff filed a complaint with the EEOC on behalf of Black Probation Officers as the Vice President of AFSCME Local 3477. Complaining that since 2008 and ongoing that the Respondent (Chief Judge has subjected Black employees to different terms and conditions of employment than non Black employees including but not limited to discipline, work assignments, transfer requests and administering of supervisory tests.

The plaintiff became president of AFSCME Local 3477 in June 2014 and continued to complain about racial discrimination. The plaintiff attempted to address the disparity of treatment of black probation officers being disciplined and investigated, however, the defendants permitted or acquiesced to actions of the Cook County Department of Juvenile Probation in making bad faith claims of misconduct by white or non-African-American probation officers so as to portray past and current disciplinary acts as evenhanded for all probation officers, regardless of race. In December 2015, during a grievance hearing held at the Chief Judge's office on behalf of probation officer Edward Walsh, a white officer, one of defendant's managers, William Patterson, stated that if defendant did not discipline Walsh the union would say that defendant was being racially discriminatory.

The plaintiff told William Patterson and the Chief Judge's designee that he should be disciplined for "just cause not just because of someone color." Edward Walsh signed a sworn affidavit attesting to this statement.

Plaintiff attempted to have AFSCME Council 31 addressed the discriminatory practices of the defendant, but they declined to address them in arbitration or through the court system when a lawsuit was filed after the Chief Judge refused to go to arbitration for the "Last Chance Agreement of Probation Officer Anthony Jordan." AFSCME failed to bring forth the argument of racial discrimination or disparity despite being aware the information provided that only black probation officers were given last chance agreements and received harsher discipline.

AFSCME Council 31 through Local 3477 executive board decided to try and retaliate against the plaintiff by making false allegations and attempting to remove the plaintiff as president from his elected office.

The plaintiff along with similar situated individuals formed a group called the African American Coalition to challenge the discriminatory practices with the Chief Judge Evans and AFSCME that were impacting African American children and employees. Instead personally taking corrective action to cure the disparate treatment complained of by the plaintiff, the Chief Judge failed and continues to fail to exercise any meaningful oversight of the Cook County Juvenile Probation Department and has abdicated his responsibility to ensure compliance with federal and state laws on race discrimination.

In March 2016, a letter and petition were created within Cook County Juvenile Probation about their disapproval of dismantling of valuable juvenile programs that were under the leadership of experienced professional African Americans. The authors and petitioners believe that the absence of African Americans in juvenile programming particularly male African Americans probation officers would be detrimental to the youth in the communities and send a negative message to those they were privileged to serve.

The plaintiff signed the petition along with forty other probation officers. This letter was sent to Chief Judge Evans and the Cook County Commissioners. On March 29, 2016, a meeting was scheduled and present was Avik Das and all of his managers. At this meeting, Avik Das claimed to be reading a series of letters written placing particular emphasis on and repeatedly saying the word "nigga." Avik Das also used other derogatory words. The reading of these letters as he claimed did not serve a purpose or intent of the meeting of why programs were being dismantle and African Americans were being removed. The plaintiff sent Avik Das an email condemning him for the use of these words and his failure to censor or used replacements words. All of the attendees of this meeting were upset and crying because of Avik Das' decision to use racially charged words. Avik Das attempted to address this issue by initially denying, but later attempted to send an apologetic email about his use of these words.

On June 27, 2016, the plaintiff requested a four day work schedule in order to return to school. The defendants denied the request and a grievance was filed without the assistance of AFSCME Council 31. AFSCME Council 31 refused to provide representation and to submit this grievance for arbitration in retaliation for the plaintiff's complaint of racial discrimination and his race.

The Chief Judge Defendants lied to the Illinois Department of Human Rights and said that no probation officer were allowed this scheduled and this schedule was not permitted because of the collective bargaining agreement. The Chief Judge defendants deviated from their policies and the collective bargaining agreement in order to discriminate and retaliate against the plaintiff.

The Chief Judge Defendants later admitted that Nicole Bradley, who is white probation officer, was allowed this schedule and it was discovered that white probation officers were allowed to work schedules outside of the collective bargaining agreement.

On July 17, 2017, Avik Das and the Chief Judge Defendants appeared in federal court in an attempt to keep the plaintiff away when the Illinois Attorney General, who is defending the discriminatory treatment for the Chief Judge Defendants, presented to Judge Ellis that "The concern was -- and it really came up with the witness we had brought, Mr. Das, who's the acting director.

He's concerned that Mr. Smith will be running for union president early next year, and he's worried that things he says in there may be used for that and to cause issues in the department outside of the litigation. That's the main thrust of why we wanted to keep him out.

On August 17, 2017, the plaintiff received notice for his scheduled deposition for September 13, 2017. During the deposition the Illinois Attorney General presented a never seen document that had my signature on the second page. I informed the Illinois Attorney General I never seen the first page. When the plaintiff arrived to the office a grievance was filed. The Chief Judge attempted to cite poor record keeping when in fact this document was planted in an attempt to impugn the plaintiff's character. The Chief Judge designee ordered the removal of the documents from the plaintiff's personnel file.

On November 17, 2017, the plaintiff filed case number 17CV8341 against the Chief Judge Defendants for racial discrimination and retaliation in the United States District Court of Northern District of Illinois Eastern Division.

After speaking to Supervisor Bennie Blair about the racial environment under the supervision of Chief Judge Timothy Evans, the plaintiff informed his supervisor that he would be resigning his position and will submit a letter of resignation. On February 15, 2018, the plaintiff texted Supervisor Blair that he appreciated everything he has done over the years and wished him the best of luck. The plaintiff submitted his letter of resignation on February 16, 2018 to Chief Judge Timothy Evans and William Patterson.

Between June 7 and 14, 2018, the Chief Judge Defendants and the City Chicago Defendants began exchanging emails. A letter was semt to the City of Chicago (C.O.P.A.) with disparaging information about the the plaintiff. The City of Chicago, COPA, Sydney Roberts, Karlo Flowers and Brandon Crase initially without reason relieved the plaintiff of his duties on June 22, 2018, Karlo Flowers later stated that this plaintiff was still being paid by the Chief Judge of the Circuit Court and this paid employment was a violation of secondary employment. City of Chicago, COPA, Sydney Roberts, and Karlo Flowers knew this was not the truth and aided and abetted the Chief Judge and his subordinates for the purpose of discrimination and retaliation against the plaintiff. The City of Chicago, COPA defamed the plaintiff when they informed a potential employer that the plaintiff engaged in misconduct or negligence that may not promote the efficiency or protect the integrity of the service.

The Plaintiff filed a complaint with the EEOC and the Illinois Department of Human Rights in July 2018.The EEOC issued the Plaintiff his right to sue in or about November 2018.The Plaintiff filed this suit in December 2018. Smith filed amended complaints and filed his last amended complaint on September 20, 2020. The Defendants filed a motion for summary judgment. On 3/30/3022 an order was entered in favor of the defendants and a final order was entered  **(App. 2-19)**

**Summary Of Argument**

The District Court erred in error when assessing if the plaintiff established a retaliation [claim] under Title VII. Smith showed he engaged in a statutorily protected activity,  his employer took a materially adverse action against him, and there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield, 926 F.3d 894, 896 (7th Cir. 2019)* Under the framework set forth in Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that his protected activity caused his termination. Id. at 765. Here, the District Court simply ignored all the evidence presented by the plaintiff as the City of Chicago had no reasonable belief that Smith was working two full time jobs, with the same hours and incapable to appear physically in two places at the same time. The District court failed to assess cumulatively all the evidence on which [Smith] relies "to determine whether it permits a reasonable factfinder to determine" that he was terminated because of his protected activity.  Therefore, this matter should be reversed and remanded for trial.

Again, the District Court ignored the evidence when it came to Smith's complaint of defamation. To state a defamation claim under Illinois law, a plaintiff must show that  "the defendant made a false statement about the plaintiff";  "the defendant made an unprivileged publication of that statement to a third party"; and "this publication caused damages." The District Court failed to take in account the required document of code of ethnics required by the COPA regarding conflict of interest. Again, the individual defendant Murphy-Aguilu was not privy to this information as he was not involved in the termination of the plaintiff's position and the letter released by COPA does not state a legal reason. Therefore, this matter should be reversed and remanded for trial.

Again, the District Court erred in error when making this assessment for Indemnification under a respondeat superior theory, for Flowers's and Murphy-Aguilu's alleged defamation. this matter should reversed and remanded for trial.

10

## Appellate Standard Of Review

"We review de novo a district court's dismissal of a claim pursuant to Rule 12(b)(6), construing the allegations in the complaint in the light most favorable to the non-moving party and giving that party the benefit of reasonable inferences from those allegations. *Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580, 591 (7th Cir. 2012); *Reger Development v. National City Bank*, 592 F.3d 759, 763 (7th Cir. 2010)." *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013).

Argument

## I. Title VII and ICRA Retaliation Claims

Title VII's antiretaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." Lord v. High Voltage Software, Inc., 839 F.3d 556, 563 (7th Cir. 2016) To establish a retaliation [claim] under Title VII, [Smith] demonstrated that he engaged in a statutorily protected activity, his employer took a materially adverse action against him, and there is a causal link between the protected activity and the adverse action." Mollet v. City of Greenfield, 926 F.3d 894, 896 (7th Cir. 2019). The District simply ignored the last fact. The first two prongs are not in question, rather the third element is in dispute.

Plaintiff began working for Cook County, Cook County Juvenile Probation Department under the Office of the Chief as a Juvenile Probation Officer in April 2003. DEF SOF 9. Plaintiff's duties as a probation officer included monitoring juveniles who had been found delinquent, preparing presentence investigations, testifying in court, and drafting violations of probation to submit to the State's Attorney's Office. He also served as the Union Vice President or President from 2012-2016. The Plaintiff filed complaints through the grievance procedure on behalf of the probation officers, eventually filing a grievance on his own behalf, (SOF 53), and a lawsuit, assisted a group of African Americans who filed a lawsuit against the Office of the Chief Judge and provided direct evidence of this discriminatory treatment of African American Probation Officers in case number: 15-cv-05907 Jordan et al v. Chief Judge of the Circuit Court of Cook County, that is preparing to go trial. Smith submitted a letter of resignation, SOF 6, sent a text to his supervisor about his resignation, (SOF3) and his supervisor sent him a congrats text on the new job.

On January 23, 2018, .Annette C. Moore, COPr'1's then Chief of Staff, sent Plaintiff an email with an attached letter extending a formal offer to Plaintiff to join COPA as an Investigator. DEF SOF 10. Plaintiff responded to Moore's email later on January 23, 2018 and accepted COPA's offer of employment. DEF SOF 11. On January 31, 2018, COPA sent Plaintiff a letter informing him to report to COPA on February 16, 2018 at 9:00 a.m. for new hire onboarding orientation. DEF SOF 12. Smith was already planning to return to school and applied to Georgetown Summer Sessions, studying for the LSAT and Truman College, began to reconsider the position with COPA because of his previous experience with the City of Chicago Fire Department. Smith initially accepted an offer of employment with the Chicago Fire Department and discovered that their schedule was not flexible. (SOF 5) He rescinded his acceptance from the Chicago Fire Department and was contemplating this same dilemma with COPA.

Smith decided no matter what he was returning to school. So, on February 8, 2018, Plaintiff informed his employer, OCJ, that he would be going on education leave beginning the week of February 12, 2018, and that his last day before going on education leave would be on February 16, 2018. DEF SOF 13. However, after a long conversation with his supervisor, he decided to resign his position and received a text from him "stating that you will be missed. (SOF 3) On April 10, 2018, the Plaintiff former supervisor Bennie Blair sent him another text "congrats on your new

job" (SOF 4) Smith began his employment with COPA on Februaiy 16, 2018. DEF SOF 14. On Smith first day at COPA he informed Moore that he was employed part-time as a police officer for the City of Berwyn. DEFSOF 15. Smith also spoke with Moore about the schedule and informed her I was on educational leave from Cook County and was skeptical about the flexibility of the schedule. (SOF 21). Moore informed Smith that he would need to submit a secondary employment form if he wanted to continued with his secondary employment. on February 16, 2018-Flowers sent an email to Plaintiff which stated, "Per your conversation with Chief of Staff Anette C. Moore, in order to maintain your employment with COPA, you must immediately terminate your part-time employment as a suburban police officer." Plaintiff tendered his resignation to both agencies on February 16, 2018. (SOF 17)


Plaintiff receive confirmation that Cook County Juvenile Probation received his letter, when they sent a termination of health benefits, (SOF 7) a congrats text from my former supervisor on the "new job." (SOF 4) Plaintiff received a fabricated termination letter from Avik Das in June 2018. The only individual who can terminate probation officers is the Chief Judge. (SOF 31) On February 22, 2018, Plaintiff executed and returned COPA's Conflict of Interest and Recusal Statement. Smith did not sign it on February 16, 2018. The Plaintiff testified that he did not want Chicago to have anything in order to justify by disciplining me or messing with my job. That's the reason why I signed on the 22nd. (SOF 24)

In May 2018, the Cook County Juvenile Probation OCJ learned that Plaintiff was employed with the City of Chicago, COPA. (SOF 45) Jennifer Nunez sent Karlo Flowers inquiring about the Plaintiff. (SOF 45) As a result, Kate Verrant ("Attorney Verrant"), A hearing officer for the Office of the Chief Judge, who had denied the plaintiff's grievances for black and Latinos called Flowers. (SOF 48) Verrant not having a legal basis or standing with the City of Chicago or Smith inquired about his employment status. Flowers, Verrant and Nunez had several calls beginning on 5/31/2018, June 1, 2018, 6/5/2018, 6/11/2018 and 6/22/2018. (SOF 29) Flowers submitted a memo to Attorney Verrant which indicated drat Plaintiff had been employed full-time with COPA as an Investigator since February16, 2018. (SOF 23). Cook County Juvenile Probation and the Office of the Chief Judge submitted an series of emails with details of a request of education leave (that was rescinded after he resigned on February 16, 2018) of Human Rights Commission, fabricated documents and trying to destroy the Plaintiff's reputation to Flowers. (SOF 19)

On June 11, 2018 Attorney Verrant sent Flowers an email with an attachment titled J. Smith's resignation documents. (SOF 46) The City of Chicago claims these were termination information, but the titled of the attachment is not termination. On June 22, ?018 Attorney Verrant sent Flowers one additional document—a false police report with the wrong address of 1515 S. Blue Island. The Plaintiff never resided at 1515 S. Blue Island. (SOF 32)

Importantly, Smith was not privy to the conversation with Attorney Verrant, Flowers or Owens that happened over several days. The Plaintiff had filed a lawsuit against OCJ, the Plaintiff filed an EEOC or IDHR charge against OCJ, the Plaintiff brought discrimination claims against OCJ before the Illinois Commission on Human Rights "HRC", and that Plaintiff complained of discrimination while employed at OCJ. The Plaintiff was also informed from someone in Human Resources that Cook County Juvenile Probation emailed Karlo Flowers information about my protected activities.

After learning about Smith's protected activity. COPA used a false document as a pretextual reason from the OC] who said terminated the Plaintiff on June 8, 2018 for engaging in gainful employment while on a leave of absence.

14

Flowers, Roberts or Auguliu could not have understood that Smith had violated COPA's rules regarding outside employment and conflicts of interest because Flowers emailed Smith in February of 2018 instructing him to terminate his secondary employment (SOF 17) Smith signed a Conflict of Intent and Recusal Statement on February 22, 2018. (SOF 15) Smith submitted his resignation letter (SOF 6) and received a congrat text from his former supervisor (SOF 4)

Flowers prepared a draft letter of termination. DEF SOF 37 and signed Roberts named to the letter. Flowers and Brandon Crase, COPA~'s then Ethics Officer and Acting General Counsel, met with Plaintiff on June 22, 2018 and informed Plaintiff that he was being terminated for violating COPA's outside employment and provided a letter to Plaintiff informing him that, "your employment as a Probationary At-Will employee with the City of Chicago, Department of Civilian Office of Police Accountability will be terminated effective today, June 22, 2018." Smith asked Flowers what secondary employment? Smith also informed Flowers he had resigned his position as requested in February 16, 2018 as instructed.

The District Court erred in error when reaching this decison. The City does not dispute the first two elements of Smith's claims, as he filed an IDHR charge against OCJ in July 2016, and the City terminated him in June 2018. Doc. 308 at 14. Under the framework set forth in Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that his protected activity caused his termination. The City faile  to articulate a reasonable alternative explanation for his adverse treatment because the evidence shows that Mr. Flowers and Ms. Moore instructed Smith to terminate his secondary employment or submit an application to continue. The plaintiff choose to terminate his employment, but the District court said that this is not enough. The plaintiff also  explained that the  alternative explanation provided by the City is a pretext for discriminatory animus because they received several emails that from his former employer that included information that was sent to the Illinois Department of Human Rights.

The District court also erred in error when it said that Smith's claims fare no better when examined through the lens of the broader question whether retaliation caused the City to fire him. No evidence in the record suggests that Smith's protected activity played any role in the City's decision. Here, Smith provided emails to the District court that demonstrated that the City and the individuals were fully aware of his protected activities. The records also demonstrated that Flowers and Roberts received the information via email that contained information about a complaint with the Illinois Department of Human Rights. The parties are aware of the purpose of this agency and clearly received this information. The individuals contradicted themselves on several occasions in the record. Murphy- Aguilu said that he was aware of Smith's protected activities and said Smith shared this information with him. However, Smith made it a point not to discuss his previous protected activities with his city coworkers. If Murphy-Aguilu was aware of Smith's protective activities it is possible the other city defendants were as well. Aguilu received information from Flowers about his termination in order to provide this information to T.S.A. With this knowledge of Smith's protected activities, the City terminated him in retaliation for engaging in them. The District Court induced from the record that "someone else beside the plaintiff submitted documentation to the IDHR." Nevertheless, the email provided in the record and produced to the City of Chicago is the plaintiff complaining about fabricated documents submitted to the IDHR and a fabricated document inserted into my personnel file.

District court wrote in their opinion " conveys that someone else submitted materials to the IHRC, not that Smith himself did so." "Nothing in the email would allow a reasonable jury to find that Flowers knew from reading it that Smith had filed an administrative charge against OCJ." Smith contends this is not true and not for the District Court to decided. Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that his protected activity caused his termination. Smith contends that all of the evidence considered as a whoere would allow a resonable jury to find this his protected activity caused his termination.

16

Smith also contends that Murphy-Aguilu's knowledge that he had been involved with AFSCME during his time at OCJ can be imputed to Flowers. Smith points to evidence supporting that theory, that Murphy-Aguilu testified that he received information from Flowers that Smith had secondary employment. The only way Murphy-Aguilu could have known about this information is either from Flowers or the emails submitted in evidence. The District Court ignored these facts. Again, a reasonable jury could find that his protected activity caused his termination because it is not mere speculation but with evidence that Flowers, Roberts and Aguliu was aware of his union activities through the emails submitted into evidence.

Also, Roberts testified that she followed the evidence during her deposition. It is all the evidence submitted to the District Court that simply chose to ignore. Because a reasonable jury could find that Smith was terminated because of his protected activity, the City should not have been granted summary judgment on his Title VII and ICRA retaliation claims.

Smith brought defamation claims against Flowers and Murphy-Aguilu based on what they told TSA. The law says,  to state a defamation claim under Illinois law, a plaintiff must show that  "the defendant made a false statement about the plaintiff"; "the defendant made an unprivileged publication of that statement to a third party"; and "this publication caused damages." Green v. Rogers, 917 N.E.2d 450, 459 (Ill. 2009).

The District Court erred in error when they decided that Murphy-Aguilu's statements to TSA about Smith were conditionally privileged, as they were made in response to inquiries from Smith's prospective employer. Smith applied for a job with TSA, prompting a TSA Personnel Security Specialist to seek information from Murphy-Aguilu about Smith's employment at COPA— specifically, Smith's dates of employment, position, type of separation, and "any derogatory circumstances surrounding his separation"—as part of TSA's "pre-employment background investigation." Doc. 325 at ¶¶ 50-51. In response, Murphy-Aguilu told TSA that Smith had been an Investigator, that he had been Murphy-Aguilu's direct report, that he had been terminated, and that he had failed to disclose secondary employment. Smith contends the Murphy-Aguilu was not privy to this information and acted recklessly and with malice when providing this information. Murphy-Aguilu was did not take part and was not a decision maker when it came to the termination of his employment. Matter of fact, the termination letter does not cite a specific reason except that Smith was an at will employee.

If a qualified privilege applies to a statement, it means that the person suing for defamation must prove that the person who made the defamatory statement acted intentionally, recklessly, or with malice, hatred, spite, ill will or resentment. Want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication, will destroy the privilege. Here, Murphy-Aguilu's did ascertain the truth because if he did, he would have requested a copy of the termination letter that would have demonstrated the reason for Smith's termination. Murphy-Aguilu first said that he could not recall where he received this information and was responding to T.S.A. as a courtesy. He also said the thinks that Mr. Flowers provided him with this information. In order to constitute reasonable grounds for belief in the truth of the defamatory matter, the belief must be based upon circumstances of adequate probative force, lying within personal knowledge or on information derived from sources of such a character as to lead a reasonably prudent man to regard it as trustworthy. Again, the court ignores the facts in this case when it comes to the plaintiff.

The court says that COPA terminated Smith because it sincerely believed, based on information provided by OCJ, that he had been employed at OCJ while working for COPA. While the court relies on this information, COPA and the individual defendants were aware that the Plaintiff could not have been in two places physically, there is no evidence pointing to any payments received from the OCJ, Smith was required to sign in physically with his time card and be present for interviews. Flowers and Murphy-Aguilu could not have reasonably believed that the plaintiff had secondary employment. By contrast, record evidence suggests that Murphy-Aguilu believed that Smith had not failed to disclose secondary employment to COPA. It follows that a reasonable jury could find that Murphy-Aguilu's statements to TSA were made either "intentionally … while knowing the matter was false" or "despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth because Smith was also his direct report and had to check in with Murphy-Aguilu daily. In addition, Flowers instructed Smith to terminate his secondary employment, but the District Court simply ignores this evidence as well.

### III. Indemnification

Smith sought indemnification against the City based on its liability, under a respondeat superior theory, for Flowers's and Murphy-Aguilu's alleged defamation. In Illinois, local government liability is governed by the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1 et seq. When application of the doctrine of public official immunity is urged, the critical question is whether the employee's conduct was "discretionary" or merely "ministerial," with the employee or government official incurring liability only where the actions at issue were not "discretionary." McKay v. Kusper, 252 Ill. App. 3d 450, 460, 624 N.E.2d 1140 (1993). Discretionary acts are those that require personal deliberation, decision and judgment, while ministerial acts are those amounting to the performance of a task in accordance with an order. Bonnell v. Regional Board of School Trustees, 258 Ill. App. 3d 485, 489, 630 N.E.2d 547 (1994). Immunity will not attach unless the injury alleged results from an act performed or omitted by the employee in determining policy and in exercising discretion. Harinek v. City of Chicago, No. 82155 (February 20, 1998). Again, the District Court erred in error. Murphy- Aguilu testified that it was not part of his job responsibilities to provide references and he did it as a courtesy. Providing references either positive or negative was his decision to exercise his personal discretion. Therefore, this count should also be reversed and remanded for trial.

**Conclusion**

For all the foregoing reasons, the judgment of the district court should be reversed and the case remanded for further proceedings before a new judge.

Jason Smith

3515 W. Cermak

Chicago, Illinois 60623

jason_smith54@yahoo.com

Respectfully Submitted,

Jason Smith Plaintiff-Appellant

By: <u>Jason Smith</u>
　　 Jason Smith

## <u>Certificate Of Compliance With Rule 32(a)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,108 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 12-point font.

Jason Smith
Jason Smith
 Plaintiff-Appellant

### Circuit Rule 30(d) Statement

The undersigned hereby certifies that, pursuant to Circuit Court Rule 30(d), all materials required by Circuit Court Rules 30(a) and 30(b) are contained in the Appendix to the brief.


Jason Smith_____

Jason Smith

Plaintiff-Appellant

**<u>Proof Of Service</u>**

The undersigned states that Plaintiff-Appellant's Appellate Brief was served on:

Sara K. Hornstra, Attorney
Direct: 312-744-4439
CITY OF CHICAGO LAW DEPARTMENT
Suite 580
Two N. LaSalle Street
Chicago, IL 60602


Suzanne M. Loose, Attorney
Direct: 312-744-8519
CITY OF CHICAGO LAW DEPARTMENT
Suite 580
Two N. LaSalle Street
Chicago, IL 60602

through the Court's ECF system on June 27, 2022


<u>JasonSmith</u>
Jason Smith

Plaintiff-Appellant

# Attached Appendix

Appendix

Judgment (03/30/2022) …………………………………………………..………App. 1

Memorandum Opinion (03/30/2022) …….……………………………....…………..App. 2-19

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Jason Smith,

Plaintiff(s),

v.

City of Chicago, et al.,

Defendant(s).

Case No.  18 C 8075
Judge Gary Feinerman

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $              ,

       which ☐ includes          pre–judgment interest.
           ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

_____

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

_____

☒    other: Judgment is entered in favor of Defendants City of Chicago, Sydney Roberts, Karlo Flowers, Brandon Case, and James Murphy-Aguilu, and against Plaintiff Jason Smith.  Plaintiff's claims against those Defendants are dismissed with prejudice, and Plaintiff shall take no relief against them.

_____

This action was *(check one)*:

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge        without a jury and the above decision was reached.
☒ decided by Judge Gary Feinerman on a motion.


Date:   3/30/2022                         Thomas G. Bruton, Clerk of Court

                                          /s/ Gary Feinerman , Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JASON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 8075 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| CITY OF CHICAGO, KARLO FLOWERS, and | ) | |
| JAMES MURPHY-AGUILU, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this suit against the City of Chicago and City employees Karlo Flowers and James Murphy-Aguilu, Jason Smith alleges that the City violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Illinois Civil Rights Act ("ICRA"), 740 ILCS 23/1 *et seq*., by retaliating against him for filing a charge with the Illinois Department of Human Rights ("IDHR"); that Flowers and Murphy-Aguilu defamed him under state law; and that the City must indemnify Flowers and Murphy-Aguilu. Doc. 227. The court previously dismissed under Civil Rule 12(b)(6) Smith's claims against the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ") and several affiliated defendants; the American Federation of State, County and Municipal Employees Council 31 ("AFSCME") and several affiliated defendants; and City employees Brandon Crase and Sydney Roberts. Docs. 147-148, 283-284 (reported at 2019 WL 6327423 (N.D. Ill. Nov. 25, 2019), and 2021 WL 463235 (N.D. Ill. Feb. 9, 2021)). The court entered partial final judgment under Civil Rule 54(b) as to the dismissal of Smith's claims against the OCJ and AFSCME defendants, Doc. 285, and the Seventh Circuit affirmed, 2022 WL 205414 (7th Cir. Jan. 24, 2022). With discovery complete, the City, Flowers, and Murphy-Aguilu move for summary judgment. Doc. 307. The motion is granted.

1

## Background

The court recites the facts as favorably to Smith as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the [other party's asserted] fact," and "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3). In addition, "[a] response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." N.D. Ill. L.R. 56.1(e)(2). Many of Smith's Local Rule 56(b)(2) responses violate the local rule by purporting to contest Defendants' Local Rule 56.1(a)(2) asserted facts with additional, non-responsive facts or with responsive facts unsupported with citations to record evidence. Doc. 325 at ¶¶ 13, 18, 21-22, 25-29, 37-40, 42-43, 48, 52-54. The asserted facts in question therefore are deemed admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the motion.") (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)).

At this juncture, the court must assume the truth of the following facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A.    OCJ Employment

Smith began working for OCJ as a Juvenile Probation Officer in April 2003. Doc. 325 at ¶ 9. Smith served as President of AFSCME Local 3477, in which capacity he filed grievances on behalf of Black probation officers alleging that OCJ engaged in discriminatory practices. Doc. 324 at ¶ 52. In 2016, Smith filed an unsuccessful grievance on his own behalf arising from OCJ's denial of his request for an adjusted work schedule, and he filed an IDHR charge against

2

OCJ regarding the same issue. *Id.* at ¶ 53; Doc. 325 at ¶ 58. Smith also participated in a race discrimination lawsuit against OCJ filed in July 2015. Doc. 323 at 9.

On January 23, 2018, Annette Moore, the Chief of Staff of the City of Chicago's Civilian Office of Police Accountability ("COPA"), offered Smith a position as a COPA Investigator. Doc. 325 at ¶ 10. Smith accepted the offer that evening. *Id.* at ¶ 11. On January 31, COPA sent Smith a letter requiring him to report for orientation on February 16 at 9:00 a.m. *Id.* at ¶ 12.

On February 8, some two weeks after he accepted the new position at COPA that was to start on February 16, Smith informed OCJ that he would be going on "educational leave" beginning on February 16. *Id.* at ¶ 13. On February 13, Smith received confirmation from Truman College that he could register for a Conversational Spanish class. Doc. 324 at ¶ 12. On February 15, Smith informed his OCJ supervisor about his new job at COPA. *Id.* at ¶¶ 2-4.

### B.     COPA Employment

COPA conducts investigations into certain incidents involving Chicago police officers. Doc. 325 at ¶ 2. Smith began working for COPA as a probationary Investigator on February 16. *Id.* at ¶¶ 1, 14, 41. That day, he informed Moore that he was a part-time police officer for the City of Berwyn. *Id.* at ¶ 15. Moore told Smith that he had to immediately resign his position as a Berwyn police officer, as it posed a direct conflict with his COPA employment. *Ibid.* Smith also told Moore that he had initially taken an educational leave from OCJ and was not sure whether his COPA employment would be compatible with taking classes. Doc. 324 at ¶ 21. At 5:00 p.m., Smith received an email from Karlo Flowers, COPA's Director of Administrative Services, stating: "Per your conversation with Chief of Staff Anette C. Moore, in order to maintain your employment with COPA, you must immediately terminate your part-time employment as a suburban police officer." *Id.* at ¶ 17; Doc. 325 at ¶ 15.

After his conversation with Moore, Smith resigned from the Berwyn police department. Doc. 325 at ¶ 16. In addition, Smith drafted a resignation letter to OCJ's Human Resources Director, William Patterson, and mailed it the evening of February 16. *Id*. at ¶ 17; Doc. 324 at ¶ 6. Smith did not receive confirmation of his resignation from OCJ and did not participate in an exit interview. Doc. 325 at ¶ 17. (Smith disputes Defendants' factual assertion that he did not receive confirmation of his resignation, arguing that he "received confirmation about his resignation when he … received the termination of his benefits notice" from Cook County, but the exhibit to which he refers, Doc. 323-10, is unreadable. *Ibid*.) OCJ's Labor and Employment Relations Counsel, Katherine Verrant, testified—without contradiction from any evidence in the record—that she never received Smith's resignation letter. *Id*. at ¶ 18.

On February 22, Smith executed and returned COPA's Conflict of Interest and Recusal Statement, which states in relevant part:

1. I have read and understand the **CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA) Conflicts of Interest and Recusal Policy (Policy)**. Consistent with the Policy, I understand and agree that, as an employee of COPA, it is crucial that I avoid conflicts of interest (potential or actual) that could undermine the independence and objectivity of my work as an employee of COPA or the work of the agency.

*** 

3. I understand and acknowledge that I must ***immediately*** disclose to COPA's Ethics Officer, ***in writing***:

   a) Any secondary employment (whether or not it relates to police matters or investigations) and any volunteer engagements that relate to police matters or investigations.

*Id*. at ¶ 19. On February 23, Smith received the COPA Employee Policy Handbook, which includes COPA's Conflict of Interest and Recusal policy, which states in pertinent part:

The City's Ethics Ordinance prohibits City employees from engaging in actions that may create a conflict of interest between the personal and/or financial interests of the employee (or family) and that of the City.

\*\*\*

COPA employees must ensure that their involvement in outside activities or relationships does [] not undermine the independence or objectivity of their work or the work of the COPA.  Outside activities and relationships, including … outside employment … that may interfere with this obligation must be disclosed to COPA's Ethics Officer.

\*\*\*

COPA employees are responsible for disclosing any actual or potential conflict of interest situation he or she is aware of to [his or her] supervisor and the Ethics Officer, each in writing … COPA employees must disclose in writing to the Ethics Officer using the Outside Employment Form (see Appendix 1.1.4A) (whether or not it relates to police matters or investigations) and any volunteer engagements that relate to police matters or investigations.

*Id*. at ¶ 20.  The COPA Handbook also includes an Outside Employment policy, which defines "outside employment" as "[a]ny paid employment performed by an employee in addition to his or her employment with the City" and requires that such employment be reported to COPA. Doc. 324 at ¶ 26.  Smith did not disclose in writing any secondary employment or conflicts of interest to COPA's Ethics Officer.  Doc. 325 at ¶ 21.

### C.     OCJ and COPA Terminations

In June 2018, OCJ learned that Smith may have held prohibited secondary employment while on educational leave from OCJ.  *Id*. at ¶ 22.  Verrant called Flowers to ask whether Smith was employed with COPA.  *Ibid*.  On June 7, Flowers sent Verrant a memo stating that Smith had been employed full-time with COPA since February 16.  *Id*. at ¶ 23.  The next day, OCJ sent Smith a letter terminating him for "engaging in gainful employment while on an authorized leave of absence."  *Id*. at ¶ 24.

On June 8, Flowers asked Verrant for "a copy of any relevant information or charges that you would potentially file, so that we can determine if any action is warranted on our part." Doc. 309-3 at 1. On June 11, Verrant sent Flowers an email with four attachments: Smith's June 8 termination letter; Flowers' June 7 memo confirming Smith's employment with COPA; a photograph showing Smith at COPA's April 9 Academy Graduation; and an email chain between Smith and several OCJ employees, titled "Educational Leave," documenting and explaining his request for educational leave. Doc. 325 at ¶¶ 25, 27-28.

The "Educational Leave" email chain begins with a February 1 email from Smith to Avik Das, OCJ's Director of Probation and Court Services, requesting educational leave from the week of February 13 through August 13. *Id*. at ¶¶ 26, 29. On February 6, Das granted Smith's request and asked for information about which school Smith was planning to attend, which course he was planning to take, and how the course was "logically related" to his employment opportunities at OCJ. *Id*. at ¶¶ 29-30. On February 8, Smith responded to Das's email by stating that he "will be attending a college that is recognized" and would be taking a course "with an emphasis on language and law," but did not name the school or course. *Id*. at ¶ 31. Smith's email stated further:

> I believe there were attachments to the memo submitted to the Chief Judge and Laura Kelly and should be provided to the additional parties attached to this email. Therefore, I have attached the Jordanette Matthews letter whereby she believes the present and past administration have tried to destroy my reputation. The original email submitted to Alton Smith where Probation Officer Bradley was granted a ten hour work shift despite the fabricated information created and submitted to the Illinois Human Rights Commission and to the Office of the Chief Judge stating no probation officer has ever had a ten hour work shift and the directive submitted from the Office of the Chief Judge to remove the fabricated document inserted into my personnel file.

*Ibid*. When sending Flowers the "Educational Leave" email chain, Verrant did not include any of the attachments referred to in Smith's February 8 email. *Id*. at ¶¶ 26-31. Flowers avers, with

no contradiction from any record evidence, that he did not understand Smith's February 8 email

to refer to any complaint or charge that Smith had filed and did not know what "fabricated

information" Smith was referring to. *Id*. at ¶ 48.

Flowers informed COPA's Chief Administrator, Sydney Roberts, that OCJ had

terminated Smith on June 7 for engaging in gainful employment while on a leave of absence; that

Smith had previously been employed full-time as a Probation Officer for OCJ; that Smith began

a leave of absence from OCJ on February 16, the same day that he began working for COPA;

that Smith had not disclosed to COPA that he was on a leave of absence from OCJ; and that OCJ

did not permit Smith to engage in gainful employment while on a leave of absence. *Id*. at

¶¶ 38-39. Based on that information, Roberts determined that Smith had violated COPA's

Conflict of Interest and Outside Employment policies, as well as its core principles of honesty

and integrity, by misleading OCJ and failing to disclose to COPA his ongoing outside

employment and conflict of interest. *Id*. at ¶ 40. Roberts decided to terminate Smith, and

Flowers drafted a termination letter. *Id*. at ¶¶ 37, 40. On June 22, Flowers met with Smith and

told him that he was being terminated due to his secondary employment. *Id*. at ¶ 41. That day,

Smith received a termination letter stating that his "employment as a Probationary At-Will

employee with the City of Chicago, Department of Civilian Office of Police Accountability will

be terminated effective today, June 22, 2018." *Ibid*.

At the time Flowers told Roberts about Smith's leave of absence and termination from

OCJ, Flowers had no knowledge that Smith had filed any lawsuit, IDHR charge, Equal

Employment Opportunity Commission ("EEOC") charge, or Illinois Human Rights Commission

("IHRC") complaint, or that he had engaged in any other protected activity. *Id*. at ¶ 42.

Similarly, at the time Roberts decided to terminate Smith, she had no knowledge that he had filed

any lawsuit, IDHR charge, EEOC charge, or IHRC complaint against Cook County or OCJ, or that he had engaged in any other protected activity. *Id*. at ¶ 43. Roberts did not personally review any documents from OCJ. *Ibid*.

Tim Saffran, a machinist employed by the City of Chicago Department of Water Management, was suspended in January 2016 for fourteen days for failing to report as secondary employment his personal business servicing municipal emergency vehicles. Doc. 324 at ¶ 56. Saffran intentionally omitted his personal business on five secondary employment forms provided to the City from 2005 through 2014. *Ibid*. Saffran was a career service employee, not a probationary employee, and his suspension was issued by a Department of Water Management Deputy Commissioner. *Ibid*.

###    D.    TSA Communications

After his termination from COPA, Smith applied for a position with the United States Transportation Security Administration ("TSA"). Doc. 325 at ¶ 50. On September 27, 2018, Smith executed a TSA Authorization for Release of Information form "authoriz[ing] the custodian of records and other sources of information pertaining to me to release such information upon request of TSA, regardless of any previous agreement to the contrary." *Ibid*. On November 21, a TSA Personnel Security Specialist emailed Smith's COPA supervisor, James Murphy-Aguilu, asking for the following information as part of TSA's "pre-employment background investigation": Smith's "dates of employment[;] position [and] type of separation (retirement, resignation, termination, lay off, etc.)[;] and if applicable, any derogatory circumstances surrounding his separation." *Id*. at ¶¶ 4, 51. The email also requested "any information in [Smith's] disciplinary file that may be relevant to his suitability," and advised that a copy of Smith's Authorization for Release of Information was attached. *Id*. at ¶ 51.

8

On November 27, Murphy-Aguilu responded by email to TSA.  *Id*. at ¶ 52.  As to

Smith's dates of employment, Murphy-Aguilu wrote: "Please see human resources - Karlo

Flower (Chief of Staff) Karlo.flowers@chicagocopa.org"; as to Smith's position and type of

separation, he wrote: "Jason was an Investigator, he was my direct report, my understanding is

he was terminated"; and as to "any derogatory circumstances surrounding his separation," he

wrote: "My understanding is he had failed to disclose secondary employment however, please

refer to Karlo Flowers if you need a more detailed description of the termination."  *Ibid*.

Murphy-Aguilu did not provide TSA with any other information about Smith, and Flowers did

not communicate at all with TSA or provide it with any information about Smith.  *Id*. at ¶¶ 53-

54.

Murphy-Aguilu testified at his deposition that he responded to the TSA email "out of

courtesy" to Smith and did not think that he "had any duty to provide any information."  *Id*. at

¶ 55.  Murphy-Aguilu was aware that Smith had been involved with AFSCME when he worked

for OCJ, but he never conveyed that information to Flowers or Roberts.  Doc. 330 at ¶ 41.

Murphy-Aguilu did not know whether Smith in fact had secondary employment, but he had been

told that Smith was terminated for having secondary employment.  Doc. 324 at ¶ 40.

Murphy-Aguilu further testified that he believed that his response to TSA was true and accurate,

that he had no reason to doubt its veracity, and that it was "extremely what [he] believed."

Doc. 330 at ¶ 40; Doc. 330-1 at 9.  No evidence in the record undermines in any way

Murphy-Aguilu's testimony in these respects.

On January 30, 2019, TSA sent Smith a letter informing him that he was "ineligible" to

work for TSA because his termination from COPA "involved intentionally doing something

9

wrong in the employer's estimation and, indicates your engaged misconduct or negligence may

not promote the efficiency or protect the integrity of the service."  Doc. 324 at ¶ 45.

**Discussion**

As noted, Smith brings retaliation claims against the City under Title VII and ICRA, state

law defamation claims against Flowers and Murphy-Aguilu, and an indemnification claim

against the City.

**I.     Title VII and ICRA Retaliation Claims**

Title VII's antiretaliation provision "prohibits retaliation against employees who engage

in statutorily protected activity by opposing an unlawful employment practice or participating in

the investigation of one."  *Lord v. High Voltage Software, Inc*., 839 F.3d 556, 563 (7th Cir. 2016)

(citing 42 U.S.C. § 2000e-3(a)).  As Smith and the City acknowledge, Doc. 308 at 17-18;

Doc. 323 at 25, the standards governing Smith's ICRA claim are the same as those governing his

Title VII claim.  *See Cary v. Ne. Ill. Reg'l Commuter R.R. Corp*., 2020 WL 1330654, at *5

(N.D. Ill. Mar. 22, 2020) (recognizing that ICRA and Title VII retaliation claims are governed by

the same standards).  "To establish a … retaliation [claim] under Title VII, [Smith] must show:

(1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse

action against him, and (3) there is a causal link between the protected activity and the adverse

action."  *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).

The City does not dispute the first two elements of Smith's claims, as he filed an IDHR

charge against OCJ in July 2016, and the City terminated him in June 2018.  Doc. 308 at 14.  The

City instead focuses on the causation element.  Under the framework set forth in *Ortiz v. Werner

Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if

the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to

find that his protected activity caused his termination.  *Id*. at 765.  To meet this burden, the

plaintiff may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Ortiz*, 834 F.3d at 765-66, but that framework is just one way that the record can allow a reasonable jury to find retaliation, *see Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a common, but not exclusive, method of establishing a triable issue of intentional discrimination") (internal quotation marks omitted).  The court therefore must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether, in its entirety, "the evidence would permit a reasonable factfinder to conclude that … [a] proscribed factor caused the … adverse employment action." *Ortiz*, 834 F.3d at 765; *see also Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004-05 (7th Cir. 2018) ("Although the oft-cited burden shifting framework from [*McDonnell Douglas*] provides a means of organizing, presenting, and assessing circumstantial evidence, we must consider the evidence as a whole in deciding whether to grant summary judgment.") (citations and internal quotation marks omitted).

Because the parties present their arguments under *McDonnell Douglas*, the court will "begin [its] assessment of the evidence by employing [the *McDonnell Douglas*] construct and address[ ] first whether [Smith] has established" a genuine dispute under that framework. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).  If Smith fails to do so, the court will then "assess cumulatively all the evidence" on which he relies "to determine whether it permits a reasonable factfinder to determine" that he was terminated because of his protected activity. *Ibid*.

The *McDonnell Douglas* framework allows Smith to forestall summary judgment if he adduces evidence showing that he (1) engaged in protected activity, (2) met his employer's

legitimate expectations, (3) suffered an adverse employment action, and (4) was similarly situated to at least one other employee who did not engage in protected activity and who was treated better—together, his *prima facie* case—provided that the City fails to articulate a reasonable alternative explanation for his adverse treatment or he shows that the proffered alternative explanation is a pretext for discriminatory animus. *See id*. at 225. Smith fails to establish his *prima facie* case under *McDonnell Douglas* because he identifies no similarly situated employee who did not engage in protected activity and was treated better than he was.

Smith argues that Saffran is similarly situated because "they both worked for the City of Chicago" and were both found by the City to have failed to report secondary employment. Doc. 323 at 21-22. Although similarly situated employees "need not be identical in every conceivable way … the distinctions between the plaintiff and the proposed comparators [can]not [be] so significant that they render the comparison effectively useless." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks omitted). That is because the "purpose [of the 'similarly situated' prong] is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Ibid*. (internal quotation marks omitted). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 847 (internal quotation marks omitted); *see also McDaniel v. Progress Rail Locomotive, Inc*., 940 F.3d 360, 369 (7th Cir. 2019) (same); *Johnson*, 892 F.3d at 895 (same).

12

As a career service machinist employed by the Department of Water Management, Saffran did not deal with the same supervisors as Smith, was not subject to COPA's outside employment or conflict of interest policies, and, unlike Smith, was a non-probationary employee. Doc. 324 at ¶ 56; Doc. 325 at ¶ 41.  Those significant differences preclude finding that Saffran was similarly situated to Smith, as they comprise multiple "other possible explanatory variables" for the fact that Saffran received only fourteen days of suspension for failing to report secondary employment while Smith was terminated for similar conduct.  *Coleman*, 667 F.3d at 846; *see also Steinhauer v. DeGolier*, 359 F.3d 481, 484-85 (7th Cir. 2004) (holding that two employees were "not similarly situated because [one] was still on probation while [the other] was not").  As Saffran is not similarly situated to Smith, and Smith does not identify any other potential comparator, Smith cannot forestall summary judgment under *McDonnell Douglas*.

Smith's claims fare no better when examined through the lens of the broader question whether retaliation caused the City to fire him.  No evidence in the record suggests that Smith's protected activity played any role in the City's decision.  To the contrary, Flowers and Roberts— the individuals at COPA who decided to terminate Smith—aver, without contradiction from any record evidence, that they did not know that Smith had filed any grievance, IDHR charge, or lawsuit against Cook County or OCJ.  Doc. 325 at ¶¶ 42-43.  Without knowledge of Smith's protected activities, the City cannot have fired him in retaliation for engaging in them.  *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 669 (7th Cir. 2006) ("[I]f an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them.") (internal quotation marks omitted).

Smith retorts that Flowers "had to understand" from Smith's February 8 email—which Verrant had sent Flowers—that he had filed an IDHR charge against OCJ alleging

discrimination.  Doc. 323 at 13, 17.  Specifically, Smith submits that this portion of his February

8 email indicated that he had filed an IDHR charge:

> I have attached the Jordanette Matthews letter whereby she believes the
> present and past administration have tried to destroy my reputation.  The
> original email submitted to Alton Smith where Probation Officer Bradley was
> granted a ten hour work shift despite the fabricated information created and
> submitted to the Illinois Human Rights Commission and to the Office of the
> Chief Judge stating no probation officer has ever had a ten hour work shift and
> the directive submitted from the Office of the Chief Judge to remove the
> fabricated document inserted into my personnel file.

Doc. 325 at ¶ 31; Doc. 323 at 17.  The email references "fabricated information created and

submitted to the Illinois Human Rights Commission," but the fact that Smith described the

information as "fabricated" conveys that someone *else* submitted materials to the IHRC, not that

Smith himself did so.  Drawing all reasonable inferences in Smith's favor, the email's references

to the "past administration … destroy[ing] my reputation" and to a "fabricated document" having

been inserted into his personnel file suggest only that Smith believed that OCJ had treated him

unfairly in some way.  Nothing in the email would allow a reasonable jury to find that Flowers

knew from reading it that Smith had filed an administrative charge against OCJ.

Smith also argues that Murphy-Aguilu's knowledge that he had been involved with

AFSCME during his time at OCJ can be imputed to Flowers.  Doc. 323 at 17-18.  But Smith

points to no evidence supporting that theory, and Murphy-Aguilu testified—again, without

contradiction from any record evidence—that he never told Flowers or Roberts about Smith's

involvement with AFSCME.  Doc. 330 at ¶ 41.  Without supporting evidence, Smith's mere

speculation that Flowers could have learned about his union activity from Murphy-Aguilu fails

to present a genuine dispute as to whether Flowers in fact was aware of his union activity.  *See*

*Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 936 (7th Cir. 2021) ("[A] party must

present more than mere speculation or conjecture to defeat a summary judgment motion.")
(internal quotation marks omitted).

Because no reasonable jury could find that Smith was terminated because of his protected
activity, the City is granted summary judgment on his Title VII and ICRA retaliation claims.

## II.    Defamation

As noted, Smith brings defamation claims against Flowers and Murphy-Aguilu based on
what they told TSA.  Doc. 323 at 13-15.  To state a defamation claim under Illinois law, a
plaintiff must show that: (1) "the defendant made a false statement about the plaintiff"; (2) "the
defendant made an unprivileged publication of that statement to a third party"; and (3) "this
publication caused damages."  *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009).

The undisputed facts show that Flowers did not communicate or provide any information
about Smith to TSA.  Doc. 325 at ¶ 54.  It follows that Flowers could not have "made a false
statement about [Smith]" to TSA, and Flowers is accordingly granted summary judgment on the
defamation claim against him.

Murphy-Aguilu argues that his communications with TSA about Smith are protected by a
qualified defamation privilege.  Doc. 308 at 20-21.  Illinois has adopted the Restatement
(Second) of Torts, which recognizes three classes of "conditionally privileged occasions": "(1)
situations in which some interest of the person who publishes the defamatory matter is
involved[;] (2) situations in which some interest of the person to whom the matter is published or
of some other third person is involved[; and] (3) situations in which a recognized interest of the
public is concerned."  *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 134-35
(Ill. 1993) (internal quotation marks omitted).  A privilege exists under the second category for
"an employer's statements in response to a prospective employer['s]" inquiries.  *Quinn v. Jewel
Food Stores, Inc.*, 658 N.E.2d 1225, 1234 (Ill. App. 1995) (holding that a former employer's

statements to prospective franchisors were conditionally privileged); *see also Roemer v. Zurich Ins. Co*., 323 N.E.2d 582, 587 (Ill. App. 1975) (holding that a former employer's statements to a placement agency "must necessarily be classified as conditionally privileged").  The basis for the privilege is that the prospective employer "ha[s] an interest in the [former employer's] evaluation as a factor to determine [the] plaintiff's capabilities."  *Quinn*, 658 N.E.2d at 1234.

Murphy-Aguilu's statements to TSA about Smith are conditionally privileged, as they were made in response to inquiries from Smith's prospective employer.  *See ibid*.; *Roemer*, 323 N.E.2d at 587.  Smith applied for a job with TSA, prompting a TSA Personnel Security Specialist to seek information from Murphy-Aguilu about Smith's employment at COPA—specifically, Smith's dates of employment, position, type of separation, and "any derogatory circumstances surrounding his separation"—as part of TSA's "pre-employment background investigation."  Doc. 325 at ¶¶ 50-51.  In response, Murphy-Aguilu told TSA that Smith had been an Investigator, that he had been Murphy-Aguilu's direct report, that he had been terminated, and that he had failed to disclose secondary employment.  *Id*. at ¶¶ 51-52.  Those statements were the extent of what Murphy-Aguilu told TSA about Smith.  *Id*. at ¶ 53.  And because they were made "in response to a prospective employer['s]" inquiries, they are protected by the qualified privilege.  *Quinn*, 658 N.E.2d at 1234.

"The qualified privilege serves to enhance a defamation plaintiff's burden of proof." *Kuwik*, 619 N.E.2d at 133.  "[O]nce a defendant establishes a qualified privilege, a plaintiff must prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness.  Reckless disregard as to the matter's falseness has been defined in Illinois as publishing the defamatory matter despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Ibid*.

16

(internal quotation marks and citations omitted).  While "the issue of whether a qualified

privilege exists [is] a question of law for the court, [] the issue of whether the privilege was

abused [is] a question of fact."  *Ibid*.

The record indisputably shows that Murphy-Aguilu believed that his statements to TSA

were true and that he did not know of any reason to doubt their veracity, Doc. 330 at ¶ 40;

Doc. 330-1 at 9, and that COPA in fact terminated Smith because it sincerely believed, based on

information provided by OCJ, that he had been employed at OCJ while working for COPA,

Doc. 325 at ¶¶ 37-40.  By contrast, no record evidence suggests that Murphy-Aguilu believed (or

had any reason to believe) that Smith had *not* failed to disclose secondary employment to COPA.

It follows that no reasonable jury could find that Murphy-Aguilu's statements to TSA were made

either "intentionally … while knowing the matter was false" or "despite a high degree of

awareness of probable falsity or entertaining serious doubts as to its truth."  *Kuwik*, 619 N.E.2d

at 133.  Accordingly, given the protections afforded by the qualified privilege, Murphy-Aguilu is

granted summary judgment on Smith's defamation claim.

## III.    Indemnification

Smith seeks indemnification against the City based on its liability, under a *respondeat*

*superior* theory, for Flowers's and Murphy-Aguilu's alleged defamation.  In Illinois, local

government liability is governed by the Local Governmental and Governmental Employees Tort

Immunity Act, 745 ILCS 10/1 *et seq*.  Relevant here, the Act states that "[a] local public entity is

not liable for an injury resulting from an act or omission of its employee where the employee is

not liable."  745 ILCS 10/2-109.  Because Flowers and Murphy-Aguilu are not liable for

defamation, Smith's indemnification claim against the City necessarily fails.

**Conclusion**

Defendants' summary judgment motion is granted.  Judgment will be entered in favor of

the City, Flowers, and Murphy-Aguilu, and against Smith.

March 30, 2022

_____
United States District Judge